IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 26, 2006 Session

## STATE OF TENNESSEE v. ANTONIO GEORGE

**Direct Appeal from the Criminal Court for McMinn County**
**No. 04-028      R. Steven Bebb, Judge**

───────────

**No. E2005-02013-CCA-R3-CD - Filed November 20, 2006**

───────────

The defendant, Antonio George, was convicted of carjacking, a Class B felony, and sentenced as a Range I, standard offender to eight years in the Department of Correction.  On appeal, he argues that (1) the evidence is insufficient to support his conviction; (2) the trial court erred in excusing a prospective juror who had a pending criminal case; (3) the trial court erred in restricting the cross-examination of the lead investigating officer; (4) the trial court erred in failing to charge the lesser-included offenses of theft and robbery; and (5) the trial court erred by not giving a curative jury instruction regarding a comment made by the prosecutor.  Following our review, we reverse the judgment of the trial court and dismiss the charge against the defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Randy G. Rogers, Athens, Tennessee, for the appellant, Antonio George.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Wylie Richardson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On December 16, 2003, the McMinn County Grand Jury indicted the defendant and two codefendants, Aaron Davis and Antwon Cook, for carjacking as a result of their taking a motor vehicle from Michelle Biggam in November 2003.

At the January 13, 2005, trial of the defendant and codefendant Davis, the victim, Michelle Biggam, testified that in November 2003 she was dating Jamichael Smith. On the evening of November 13, 2003, she went with Smith to Eric Brown's residence in Athens and waited in Smith's car, with the engine running, while he went inside. As she was sitting in the passenger's seat, a man opened the car door, pointed a gun toward her face, and pulled her out by the arm, saying, "Bitch, get out." The man then threw her over a small brick wall, and she ran to the front door of the house and knocked because the door was locked. As Smith let her inside, Biggam told him what had happened and he called the police. She said that the perpetrator was wearing a black, hooded sweater and that he was an African-American, but she could not "describe exactly what he looked like in detail." Asked if the perpetrator had been alone, Biggam said, "When he pulled me out it's like I just felt other people there next to me, but I couldn't tell you that I actually looked over and saw them, but I just felt them there."

Jamichael Smith testified that he had only been inside Brown's house for five or ten minutes when he heard a loud noise, looked out the kitchen window, and saw two men getting in his car, a 1983 custom-painted, electric green Buick Regal. He said he had left the car running with the parking lights and windshield wipers on. He saw one man get in on the driver's side and a second man get in on the passenger's side. Biggam banged on the door and, as he let her inside, she told him, "They pulled a gun on me and they are taking your car." Smith said he immediately called 9-1-1. Smith identified photographs of the interior of his car depicting where his CD player had been "ripped out" and his work identification card lying on the seat. He denied that he had any clothing or ski masks in the backseat of the car.

Officer Steven Thomas of the Athens Police Department testified that on November 13, 2003, he responded to the carjacking call, which included a description of the car and the address from where the crime had been reported. According to the call he received, the carjacked vehicle had last been seen traveling toward Decatur Pike on Howard Street. Within a matter of minutes, Officer Thomas saw the vehicle at the intersection of Congress Parkway and Decatur Pike, pulled in behind it, and activated his blue lights. After the vehicle "took off through the red light at the intersection," Officer Thomas turned on his siren and pursued the vehicle for about forty-five minutes. A state trooper tried to stop the vehicle, but the driver rammed the vehicle into the back of the trooper's car. Officer Thomas pulled his car to the right to prevent the vehicle from going around the trooper, and the driver then rammed the vehicle car into Thomas' car. The driver and two passengers "started bailing out of the car before it even stopped." According to Officer Thomas, the driver "went out the driver's side window, and then the rear passenger went out the same window right after him, and then the front right passenger went out the passenger side door and they all began running." Officer Thomas apprehended one of the passengers whom he identified as codefendant Davis. He said the defendant was the passenger in the backseat and was apprehended in a creek bed about fifteen to twenty minutes later. Officer Thomas said he got "a pretty clear view" of the defendant because "as they would hit the trooper's car [the defendant's] head would jerk and I could see him look around at me as they were hitting the trooper's car."

Officer Thomas said ski masks and gloves were found inside the vehicle, and a Taser gun was found about four or five feet from the driver's side of the vehicle. Officer Thomas subsequently turned the seized evidence over to Detective Patrick Upton. He identified photographs of the vehicle depicting the front console where the radio had been pulled out and the seat containing various items, including the work identification card of Jamichael Smith, as well as photographs of two ski masks and work gloves found in the rear of the vehicle. On cross-examination, Officer Thomas said that codefendant Cook was the driver of the vehicle and acknowledged that no weapon was found in the vehicle.

Investigator Patrick Upton of the Athens Police Department testified that he investigated the carjacking and identified the black ski masks, gloves, and Security Plus Taser gun given to him by Officer Thomas on the night of the incident. He acknowledged that none of the items were analyzed or fingerprinted.

The defendant did not testify or offer any proof in his behalf.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his conviction for carjacking, saying that the evidence was circumstantial and that he was never identified as one of the perpetrators. The State counters that the evidence is sufficient to support the jury's conclusion that the defendant participated in the carjacking.

Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Thus, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor

on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A conviction based on circumstantial evidence is permitted in Tennessee. State v. Tharpe, 726 S.W.2d 896, 899 (Tenn. 1987). Whether the conviction is based upon direct or circumstantial evidence, the standard for appellate review is the same. State v. Johnson, 634 S.W.2d 670, 672 (Tenn. Crim. App. 1982). On appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). The weight given to circumstantial evidence is for the jury to determine. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974). Circumstantial evidence alone may be sufficient to convict one of a crime, if such evidence sufficiently proves all the necessary elements. Tharpe, 726 S.W.2d at 899-900. In cases that hinge upon circumstantial evidence, it is well settled that the proof must be consistent with the guilt of the defendant and inconsistent with his innocence, and sufficiently strong to overcome every other reasonable hypothesis except that of guilt. Id. at 900; State v. Bigsby, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000).

The defendant was convicted of carjacking, which is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) [a] deadly weapon; or (2) [f]orce or intimidation." Tenn. Code Ann. § 39-13-404.

In brief, the evidence in this case showed that a person wearing a ski mask and with a "black face" pulled the victim out of her boyfriend's car. She felt that he was being assisted by others but did not see them. She ran into the house, and her boyfriend, looking out the window, saw two men get into his car, entering in the front on the driver and the passenger's side. He telephoned the police as the car was driven off. A police officer, hearing the call, waited and gave chase as the vehicle went past him. The record does not reveal the time at which the police were called informing them of the stolen vehicle, the time at which the officer received the call, or the time at which he spotted the vehicle. Thus, in a nutshell, the evidence shows that two men entered the car in which the victim was sitting and drove it away, and a short time later and approximately a mile away from the location of the carjacking, officers spotted and began a forty-five-minute chase of the vehicle. The chase ended when three men bailed out of the vehicle, the defendant coming from the backseat. Even assuming that two of the men in the vehicle were the two the victim's boyfriend had seen drive off with it, the record does not reflect which two of the three they were. One might surmise that the defendant was the last to enter the vehicle, since he was sitting in the backseat as the chase ended, but there is no basis in the record for such an assumption. In short, the proof is not inconsistent with the defendant's having been picked up by the two carjackers during the period from when they left the location of the carjacking until the chase began. In fact, while it would appear likely that two of

-4-

the three men who bailed out of the car were the two seen by the victim's boyfriend, there is no way to determine which two these were. Accordingly, we conclude that the proof is insufficient to sustain the conviction. The charge of carjacking is dismissed.

## II. Excusing of Prospective Juror

The defendant next argues that the trial court erred in sua sponte excusing a potential juror without voir dire because the juror had a pending criminal case. The State counters that the trial court did not abuse its discretion in excusing the juror, whom the trial judge recognized from the juror's pending criminal case in the same court.

During the jury selection process, the following colloquy occurred during a bench conference:

[COUNSEL FOR CODEFENDANT DAVIS]: We just want to know why that juror was released, your Honor.

THE COURT: That juror has pending criminal charges in this court. It's sort of funny, I looked up and I thought he looked familiar. I just arraigned him, I mean he was just placed on the jury panel, and then I think arrested on a theft charges [sic]. I told him, I said tell him until those charges are resolved he cannot serve on a jury, and thank him for his service.

[DEFENSE COUNSEL]: That's why I kicked my last two off, I was trying to get to him, Judge. I didn't know that would disqualify him.

THE COURT: It does disqualify you.

[DEFENSE COUNSEL]: Well, just for the record, we are court appointed, and we object. We think that should not disqualify him. He has not been convicted of anything that I know of –

THE COURT: True. I just don't think it's in the best interest of anybody to have somebody serve on a jury that's under indictment, and I told him, I said, "You tell him if he's found not guilty why we will be calling him for jury duty again, but he's excused for this time."

[COUNSEL FOR CODEFENDANT DAVIS]: We want to object for the record, your Honor.

THE COURT: Let the record show that both defendants have objected.

"The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion

of the trial court." State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). Although complaining about the manner in which the trial court excused this juror, the defendant has not alleged that the jury hearing the charge against him was not competent, unbiased, and impartial. Accordingly, the record does not reflect that the trial court abused its discretion in excusing this juror.

### III. Limited Cross-Examination of Witness

The defendant argues that the trial court erred by restricting his cross-examination of Investigator Upton "with regard to his failure to request fingerprints or DNA analysis on recovered items from the alleged highjacked vehicle by ruling that if counsel asked about DNA testing or fingerprints that such questions would allow the Court to reverse the Court's ruling on the Motion in Limine concerning statements of the co-defendants being tried jointly." The State contends that the defendant has waived this issue for failure to cite any authority in support of his claim.

During his direct examination, Investigator Upton identified the ski masks, gloves, and Taser gun given to him by Officer Thomas on the night of the carjacking. Defense counsel objected to the admission of these exhibits as to relevance, and the trial court overruled the objection. Counsel for codefendant Davis then asked Investigator Upton if any of the items had been analyzed or fingerprinted, and he replied that they had not. During defense counsel's cross-examination of Investigator Upton, the following transpired:

> Q      Mr. Upton, certainly as an experienced police officer you are aware that there is potential for submitting garments, head dresses and such –
>
> THE COURT: You might ought to approach up here.
>
> (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING TOOK PLACE OUT OF THE HEARING OF THE JURY:)
>
> THE COURT: This line of questioning could possibly open the door to your client's statements if you think about it. I don't know what all is in the statement, but if you keep asking along this line he might say, "No, they confessed and I didn't need to."
>
> [DEFENSE COUNSEL]: I don't recall all the statements, but –
>
> THE COURT: I don't either, but I'm just saying it's a dangerous issue. Do you want to send the jury out and explore it further?
>
> [DEFENSE COUNSEL]: Your Honor, I'm not trying to create a problem but –

THE COURT: I don't want to create a problem for you or him, and so let's ask them to step outside.

. . . .

THE COURT: Well, let me just say this: sometimes there's statements and sometimes there's extra questions asked of defendants. I don't want you to be on the horns of a dilemma here. He's about to ask you why you didn't have them tested. Did you interview the defendants?

MR. UPTON: Yes, I did.

THE COURT: And did either one of them ever say they had ski masks?

MR. UPTON: They didn't say that they had a ski mask[] but they put themselves in the vehicle. They didn't say they had a ski mask.

THE COURT: All right. Then you have got a right to ask that question. I just didn't want to be in a position of –

[DEFENSE COUNSEL]: I appreciate your Honor asking that question but I didn't recall it, but –

THE COURT: I felt sure it wasn't in the written statements but I didn't know whether anybody told him anything or not, and I didn't want to get you all in that lock box, because I would wind up taking the blame for that if I do.

[DEFENSE COUNSEL]: All right. Judge, while the jury is out[,] the question, and I know it's an issue that's not simply just answered by my question, but this Taser thing, I just want to go into the fact that Mr. Upton is aware of what those are used for, that they are not deadly weapons, but I don't want to waste his time if he doesn't know, and while the jury is out, if I ask you if that weapon, based on your training and experience, is a Taser, is that a deadly weapon you can kill somebody with?

THE COURT: Of course there are a lot of lawyers now that are claiming it is.

. . . .

MR. UPTON: There has been documented cases where they have caused death though, that's for sure.

-7-

THE COURT: Then that's what he would have to answer.

MR. UPTON: And also if he asked the question about why I didn't do the test[,] the statements was [sic] one of the reasons why I didn't, and so, you know, do I say I took the statements or –

THE COURT: What he's saying is the reason he didn't have them tested is because both the defendants admitted to being in the car. I think he would be allowed to say that if you ask him that question.

[DEFENSE COUNSEL]: But my dilemma is, though, you know, the lady didn't say anything about a ski mask or gloves, and I'm not trying to pull the wool over your eyes, she did say something about a gun and so the Taser could actually be confused for a gun, but there's no testimony that these black men she described, or the one black man she saw, she didn't say he had on white gloves –

THE COURT: [Defense counsel], the problem you get into in a "carjacking," if somebody gets in there and they've got weapons of any kind or force somebody out of a car and they've got ski masks, who knows what they are planning to do with those ski masks. They are relevant. I mean I don't know about this particular case but –

[DEFENSE COUNSEL]: I'm not trying to argue with the Court but –

THE COURT: Everywhere you look . . . there's a murder and a carjacking, a robbery and a carjacking, all these things, a jury has a right to hear that there were ski masks in the car.

[DEFENSE COUNSEL]: I'm just thinking out loud, Judge –

THE COURT: Okay.

. . . .

[DEFENSE COUNSEL]: Is your Honor ruling if I ask the question, my question was he aware that you can test for DNA on head gears and clothing and that sort of thing?

THE COURT: And if he says "yes" are you going to say why –

[DEFENSE COUNSEL]: Well, he has already been asked did he do it. No, I would stop there, but the next question would be could you verify whether or not Mr. Smith or any of these people we are talking about had ever worn that by that test.

THE COURT: Well, how do you keep him from being able to explain why he did or didn't do something? How is that fair?

[DEFENSE COUNSEL]: Well, I guess my answer to that is I think it is, but if your Honor is ruling that it's not then I won't open that door.

THE COURT: Well, I don't think it's fair for an officer, when he does something to say why did you do it, and when he didn't do something why did he do it?

[DEFENSE COUNSEL]: I understand, I'm not trying to argue with the Court, I'm just trying to get to ground zero here, your Honor.

THE COURT: I understand. Yes, that's my ruling.

As we understand this issue, it arose when defense counsel was asking Investigator Upton whether he was "aware that there is potential for submitting garments, head dresses and such," and the trial court interrupted by advising counsel he was getting into a "dangerous" area. After extended discussion, defense counsel explained that he wanted to ask the witness "was he aware that you can test for DNA on head gears and clothing and that sort of thing?" Contrary to the defendant's phrasing of this issue, the court did not advise counsel that he could not ask this question. Instead, the court ruled that, in so asking, counsel would open the door for the witness to explain that he had not sought such testing because the defendant had given a statement, which was not being utilized at the trial because of <u>Bruton</u> considerations, admitting that he had been in the vehicle. Thus, the first portion of this claim, that the trial court restricted the cross-examination of Investigator Upton, is without merit because the record shows that this did not occur. The second portion of the claim is that the trial court erroneously ruled that the defendant's asking Investigator Upton whether he had submitted the ski masks for DNA testing would open the door for Upton to explain why he had not done so. Since the defendant did not ask the question, the court's ruling was, and remains, theoretical only. However, it is clear that his argument is without merit.

It is well settled that witnesses are allowed to fully explain and provide a reasonable context for their answers, regardless if the explanation involves prior events. <u>See</u> <u>Sistrunk v. State</u>, 630 So. 2d 147, 152 (Ala. Crim. App. 1993) (evidence of the defendant's previous drug offenses was allowed to correct and explain "adverse inferences" made by the opposing side); <u>Pankow v. State</u>, 895 So. 2d 1149, 1151 (Fla. Dist. Ct. App. 2005) (defense's questioning and inference about evidence of a struggle opened the door for the expert witness to show how the victim's marks corresponded to struggle); <u>Funderburk v. State</u>, 471 S.E.2d 535, 536 (Ga. Ct. App. 1996) (defense's questions about a chemical test opened the door for the witness to give reasons for the test not having been performed, so as to correct a mistaken inference); <u>Commonwealth v. Charles</u>, 712 N.E.2d 613, 615 (Mass. App. Ct. 1999) ("[A] witness should have the opportunity to explain why he or she did or did not do certain things which were the subject of questioning on cross examination."); <u>State v.</u>

-9-

<u>Hammond</u>, 435 S.E.2d 798, 801 (N.C. Ct. App. 1993) (witness may testify on redirect "that her husband [the defendant] 'beat [her] all the time'" to explain her cross-examination testimony).

This issue is without merit.

## IV. Lesser-Included Offenses

The defendant argues that the trial court erred by denying his oral request to instruct the jury on the lesser-included offenses of theft and robbery. The State contends that the defendant has waived this issue because he never submitted a written request for these instructions.

Tennessee Code Annotated section 40-18-110 requires, in pertinent part:

> (b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any such charge.
>
> (c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

Tenn. Code Ann. § 40-18-110(b), (c) (2003) (emphasis added). In the recent case of <u>State v. Page</u>, 184 S.W.3d 223, 229 (Tenn. 2006), our supreme court, reviewing the constitutionality of section 40-18-110, noted that the statute "places a duty on the defendant to request a lesser-included offense in writing at trial to assign as error on appeal the trial court's failure to instruct on such offenses." The court, concluding the statute was constitutional, explained:

> [T]he waiver of a lesser-included offense for purposes of plenary appellate review is constitutionally permissible. A trial court's failure to instruct on lesser-included offenses is not a structural error. <u>See</u> <u>State v. Allen</u>, 69 S.W.3d 181, 190-91 (Tenn. 2002) (Holding that failure to instruct on lesser-included offenses is subject to constitutional harmless error analysis). As a non-structural constitutional error, the omission of a lesser-included offense instruction is subject to waiver for purposes of plenary appellate review when the issue is not timely raised and properly preserved. <u>See</u> <u>State v. Terry</u>, 118 S.W.3d 355, 359 (Tenn. 2003) (defendant's failure to request lesser-included offense instruction at trial or in a motion for a new trial waived issue). Similarly, issues involving other non-structural constitutional errors must be preserved to receive plenary appellate review. <u>See</u> <u>State v. Gomez</u>, 163 S.W.3d 632, 645 (Tenn. 2005) (Sixth Amendment right to confront witnesses).

Id. at 230 (footnote omitted).

In his brief, the defendant states that he "requested the State to charge the lesser included offenses of theft and robbery . . . and submitted written copies of the authority contained in State v. Dowell (Tenn. Cr. App. June 27, 2003) and T.C.A. 39-13-404 setting out the fact that lesser included offenses are recognized under the offense of car jacking [sic]."

At the conclusion of the State's proof, defense counsel orally requested the trial court to instruct the jury as to the lesser-included offenses of theft and robbery.[1]  In overruling the defendant's motion, the trial court stated:  "Well, the proof is not there, and without that proof I don't think that a lesser included theft or robbery is appropriate.  Facilitation may be, I don't know."

A "defendant's failure to request a lesser-included offense instruction in writing waives the right to raise such omission as an issue on appeal." Page, 184 S.W.3d at 229.  Accordingly, this issue is waived.  However, we will review the trial court's not charging lesser-included offenses under the doctrine of plain error.  Id. at 230.  When determining whether such a review is appropriate, the following factors must be established:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003) (citing State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).  In addition, "[a]ll five factors must be established by the record before" an appellate court may "recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established."  Id. (citing State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000)).

In State v. Harold Holloway, Jr., No. E2004-00882-CCA-R3-CD, 2005 WL 1981791, at *10 (Tenn. Crim. App. Aug. 16, 2005), this court held that theft and robbery were not lesser-included offenses of carjacking.  In State v. Kerry L. Dowell, No. M2002-00630-CCA-R3-CD, 2003 WL 21486978, at *16 (Tenn. Crim. App. June 27, 2003), perm. to appeal denied (Tenn. Nov. 24, 2003), this court held, without analysis, that they were lesser-included offenses of carjacking.  We agree with the analysis in Harold Holloway, Jr. and conclude that since neither is a lesser-included offense of carjacking, the trial court did not commit plain error in refusing to include them in the charge to the jury.

---

[1]The defendant also requested the trial court to instruct the jury on accessory after the fact and joyriding, which the court denied.  On appeal, the defendant does not challenge the court's ruling as to those two offenses.

### V. Curative Jury Instruction Regarding Prosecutor's Comment

The defendant argues that the trial court erred by not giving the jury a curative instruction to disregard a comment made by the prosecutor "on the fact that the defendant . . . did not immediately upon being taken from a vehicle he was not driving or in control of, protesting his innocence." The State counters that the defendant has waived this issue for failure to object at trial or raise it at any time before the motion for new trial.

The comment the defendant complains of was made during the State's closing argument when the prosecutor said:

> Now, the evidence has shown us this: that the car was observed by the police shortly afterwards, and after the chase and when they finally brought this car to a stop, all three of the defendants were present and all three of them bailed out. No one got out and said, "Hey, man, I sure am glad you all finally got here, I was here against my will." All three of them, according to Officer Thomas' testimony, took off running at the time that they were apprehended. . . .

After the closing arguments had been made and the trial court had instructed the jury, counsel for codefendant Davis, in a jury-out hearing, objected to the prosecutor's comment:

> [COUNSEL FOR CODEFENDANT DAVIS]: Your Honor, during the General's closing he made the comment about why didn't they get out and say "I'm not involved." That I feel is commenting on the defendant's right not to testify.
>
> THE COURT: I will overrule your objection.

However, counsel for the defendant never made an objection to the prosecutor's comment. In his motion for a new trial, he alleged only that the State's "closing argument was a comment on the defendant's right not to testify."

In a nutshell, it appears that the defendant, relying on an objection made by counsel for the codefendant after the jury instructions had been read, raises this argument for the first time on appeal. The State responds that the argument is waived, and we agree. See Tenn. R. App. P. 36(a).

### CONCLUSION

Based upon the foregoing authorities and reasoning, we reverse the judgment of the trial court and dismiss the charge against the defendant.

_____
ALAN E. GLENN, JUDGE